**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 24-cr-113-NYM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2. CARIE L. HALLFORD,

      Defendant.

---

**DEFENSE SENTENCING STATEMENT AND REQUEST FOR GUIDELINE
SENTENCE**

---

    Ms. Carie Hallford, through undersigned defense counsel, submits the following Sentencing Statement and request for a sentence within her Guidelines, respectfully requesting the Court impose a sentence of 97 months confinement in the Bureau of Prisons.  This request complies with the defense stipulations of the proposed plea agreement.  ECF. No. 136, ¶ (I)(A)(4).  A sentence of 97 months imprisonment, the very top end of her guidelines, is also of a length and type that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).

**I.  Introduction**

    Ms. Carie Hallford fully recognizes the severity of her crimes, especially as to the relevant conduct in her case.  Under advice of counsel and the due process afforded by the criminal justice system in the United States, Ms. Hallford has remained silent and

exercised her other rights through the many twists and turns of the instant case and her state criminal case as well.  She comes to the Court, and the victims of her case, in this filing and at her sentencing with a deep sense of shame, but also a sense of relief in finally being able to verbalize her feelings of remorse.  Hopefully, her words will provide a sense of closure and justice to those she has wronged.

Based upon statements made in pleadings, at other hearings, and in the media, she recognizes that her apologies will likely fall on deaf ears.  Nonetheless, she sincerely hopes by showing her contrition, requesting the maximum guidelines sentence, and providing full context to her poor choices, the Court and the victims will come to see her not as a calculated monster knowingly conning vulnerable people, but as a scared and desperate mother being manipulated by her husband into maintaining a business façade and the illusion of a prototypical suburban family.

## II.  Summary of Argument

Ms. Hallford, through defense counsel, asserts that 97 months in the Bureau of Prisons (BOP) will be a sentence sufficient but not greater than necessary to achieve the purposes of sentencing.  18 U.S.C. § 3553(a).  While fully confessing the aggravated nature and circumstances of her offense, Ms. Hallford still hopes the Court contrasts those against a lifetime of being a law-abiding mother and hard-working clinical pathologist.  *Id*. at (a)(1).  Ms. Hallford, having seen and heard the pain and anguish of her victims understands the seriousness of her actions.  She has lost her job, her children, and her

freedom and her continued incarceration for a 97-month term will continue to provide just punishment and retribution for the victims. *Id*. at (2)(A).[1]

While her lack of criminal history would indicate the community need not be concerned with future crimes, the requested sentence will protect them for nearly a decade. *Id*. at (2)(C). The absence of priors also should indicate to the Court that specifically deterring Ms. Hallford from future criminal conduct will not be an issue. *Id.* at (2)(B). Her request for a maximum guideline sentence reflects precedent holding that general deterrence plays a particularly important role at sentencing. *United States v. Walker*, 844 F.3d 1253, 1258 (10th Cir. 2017).

Ms. Hallford requests the most severe "kind of sentence available" and a sentence that reflects the maximum for the applicable category of offense committed as set forth in the guidelines. *Id*. at (3) and (4); ECF No. 63-1. As discussed further *infra*, the requested sentence avoids unwarranted sentencing disparities with other defendants sentenced under U.S.S.G. § 2B1.1(b); 18 U.S.C. § 3553(a)(6). Finally, but maybe most importantly, the requested sentence will allow Ms. Hallford, at age 49, to complete her sentence, return to work and meaningfully contribute to the stipulated amount of restitution. 18 U.S.C. § 3553(a)(7).

As part of her request, Ms. Hallford does not object to the guideline determination made in the presentence report, including the proposed enhancements. ECF No. 71-1.

---

[1] For reasons further explained on ==page 19 *infra*== Ms. Hallford also believes the Court should adjust her sentence by 432 days to account for the time she has been held on the instant case.

She has no objection to the restitution amounts as calculated by the prosecution and particularly hopes to repay the amount ultimately ordered to the victims.

### III.  Circumstances of the Offense and Characteristics of Ms. Carie Hallford

One suspects that the legislature combined the circumstances of the offense with the history and characteristics of the defendant because the latter also frequently explicates and contextualizes the former.  18 U.S.C. § 3553(a)(1).  Such is the case with Ms. Hallford.  An examination of the facts of the case yields an aggravated, negative view of the defendant.  But a deeper examination of her entire life and true characteristics yields a more logical, mitigated understanding of how she came to commit these crimes.  A great paradox exists in the instant case:  One might assume she acted without concern of consequences or the feelings of others.  Neutral parties and the victims would suspect that she had an anti-social personality disorder.  In reality, Ms. Hallford's actions were motivated by fear and severe anxiety.  Even though many observers may not believe it, her personal history tells the story of a very different person.

#### A.    Early Life and First Divorce

Ms. Hallford's family will tell you that they knew her as a quiet, at times shy, God-fearing rule follower.  Born in 1976 in Bristow, Oklahoma, she met her biological father once, at age 10.  Her mother re-married when she was 12 years old.  From then she lived with her mother, stepfather and older sister with her maternal grandparents offering a strong sense of support as well.  She graduated high school in central Oklahoma, went to community college, worked her way through a Bachelor of Science degree from the

University of Central Oklahoma, and, in 2001, obtained a certification from the American Society for Clinical Pathology. Her family knew her to be helpful, loving, and kind.

Ms. Hallford was 24 years-old when she married her first husband. She gave birth to her son in 2005 and her daughter the next year. After some 10 years of marriage, she divorced her first husband. The split itself could be characterized as amicable, but the underlying reasons for the divorce involved her first husband's jealousy, infidelity, and a recurrent pattern of blame and criticism. For someone baptized at the Bristow Church of Christ the divorce represented a failure. Even though she was not at fault, Ms. Hallford internalized much of the blame for her marriage ending and felt she had failed as a prototypical Christian wife. Although she could not have realized it at that time, the emotional scars from her first marriage and resulting religious conviction to never divorce again made her an ideal target for next husband, Jon Michael Hallford.

Many times, a sentencing court views a lack of childhood trauma, substance abuse history or mental health problems as aggravating. After all, a disadvantaged defendant making the same poor choices as Ms. Hallford presents a more mitigated case for sentencing. Respectfully, defense counsel submits that argument, while logical, punishes Ms. Hallford for conditions of her upbringing that were out of her control while downplaying the possibility that other environmental factors can exist to a degree that they overcome the relative advantages of her youth. Clearly, Ms. Hallford functioned as a hard-working, well educated, gainfully employed, law-abiding mother of two for the first 40-plus years of her life, so what happened?

**B.    Jon Michael Hallford**

Carie Hallford met Jon Michael Hallford in October of 2012 while still in the shadow of the divorce from her first husband.  At the time, she faced stress as she tried to navigate being a co-parent for the first time.  In Jon she saw a charismatic, energetic man offering confidence and protection; two things that there were in short supply for Carie at that time. He positioned himself as a source of strength and reassurance during a vulnerable period.

Their relationship progressed quickly: early cohabitation, rapid emotional intimacy, and promises of a bright future if she agreed to move away from her family.  However, from the outset, Jon operated with classic instruments of domestic violence to control Carie.  Almost immediately, he forced her into isolation.  At first, he demonized her ex-husband.  He would call the ex-husband a "piece of shit" in front of the children, made a point of excluding him from the kids' birthdays and insisted that Carie's children refer to him as "dad" despite the newness of the relationship.  Jon leered over every co-parenting interaction, often becoming jealous and irate if he felt Carie was accommodating her ex-husband in some fashion (*e.g.*, Defense Exhibit #1, p. 14).[2]  As was her personality and, in fact, what she believed to be her religious obligation, Carie did her best to smooth things over and de-escalate any conflict.

In 2013, after being together for less than two full years, Jon convinced Carie they needed a fresh start in Colorado.  Jon, Carie, and her two children moved to Colorado

---

[2] Defense counsel has attached five different instances of text messages from Jon Hallford (blue messages) to Carie Hallford (green messages) that appeared in discovery.  These messages are specific examples related to the abuse being discussed in this filing. They also generally illustrate Mr. Hallford's tone and treatment of Ms. Hallford throughout the 4,168 pages of text messages occurring between May 1, 2022, and October 4, 2023, that were part of discovery.

where Carie immediately found work due to her professional and educational experience. They had very little money aside from her income.[3]

Jon had moved the family to the Denver area because he said he had been hired by an area funeral home. However, he never went to work at that job. According to Jon, there was an on-going issue with his background check being delayed due to circumstances beyond his control. Eventually he gave up on that job and took an entry-level position marking underground utility lines. Carie remembers discovering his gambling addiction during this time and, in one instance, he was forced to apologize for losing their rent money on an overnight trip to a casino. By the end of 2014, Jon obtained a job at a funeral home in the Colorado Springs area. The family moved there and Carie found work at Pikes Peak Regional Hospital where she worked as a laboratory technician.

From 2014-2017, the family enjoyed financial stability, however, the same could not be said for their marriage. The domestic violence only intensified. Any action by Carie that hinted at independence or autonomy was met with stiff opposition. Speaking to her family was characterized as engaging with jealous family members. Drinks with co-workers would turn into an obsessive stream of texts that would conclude with hurtful allegations that she had abandoned her family. He pretended that he wanted to be the breadwinner, saying that he did not want Carie to have to work. In reality, he could not

---

[3] For the first few months Mr. Hallford used money they had received when he totaled Ms. Hallford's car. Rather than working, he reduced the family to a single vehicle and spent through the cash from the insurance company.

provide for his family but still relished the control that would come with making financial decisions and keeping Carie at home.

Throughout the marriage Carie endured attacks on her physical appearance, her homemaking skills, her mothering, and her intelligence. One of Jon's favorite lines was to belittle something Carie did or said and then add, "it's a good thing you're pretty." There were wild, unpredictable mood swings ending with Jon threatening to kill himself or Carie (*e.g.*, Defense Exhibit #1, pp. 10, 12). In one instance he threatened to shoot Carie in the face with a gun. Another time he smashed a coffee cup against the wall. Most of the severe acts were followed by a period of reconciliation and love-bombing.[4] This led to some of the most egregious and most vilified spending. ECF Nos. 136, p. 19, 145, pg. 9, and No. 146, p. 12. Although Jon was prone to vanity purchases such as the new SUV and cosmetic cryotherapy to sculpt his abdomen, a significant portion of the money was spent on family vacations and gifts to his wife as an apology for his abuse.[5] Carie carried an enormous amount of guilt over her inability to stop the financial spiral, but also was too afraid of the consequences of confronting Jon about the problem.

Jon also used sexual intimacy as a means of coercion and control. Any rejected overtures were proof Carie no longer loved him or she was abandoning her role as his wife (*e.g.*, Defense Exhibit #1, pp. 5-8). On multiple occasions, she would awake to Jon having sex with her, and one occasion while both parties were on bond for the state case, he

---

[4] "What is the Cycle of Abuse and How Do you Break It?" Cleveland Clinic, June 10, 2024, https://health.clevelandclinic.org/cycle-of-abuse.
[5] Ms. Hallford never had any cosmetic or plastic surgery while she was with Mr. Hallford.

grabbed Carie by the face and said, "You're mine!"  On another occasion, he threatened to find someone else that would "appreciate" him.[6]

Carie felt she needed her husband's permission to seek counseling.  His response was to gaslight her by denying the existence of a problem, once saying, "if you need someone to talk to that badly then maybe you're too weak for this relationship."  Another time, he dared Carie to call the police to report his abuse stating, "Go ahead, I'll tell them you're the crazy one and you'll lose your kids."  Jon had systematically isolated Carie from any sense of support and convinced her any avenue of help would only result in her losing her family.

Jon's treatment of the children largely mirrored his treatment of Carie.  Concerned neighbors would hear Jon's screaming and offer help while the children hid in their rooms. Her son left the home as soon as he turned 18.  Her daughter did not want to be home alone with Jon.  The abuse culminated with his sending of explicit text messages to Carie's daughter which included images of him shirtless, another in his underwear, and a request to join in him bed for a cuddle.[7]

By 2019, Jon convinced Carie that she needed to quit her work at the hospital and help him with his business in order to "save their family."  At first, she worked in a purely administrative capacity.  But quickly, Jon persuaded her to do more.  He would point to his

---

[6] A documentary released in February of 2025 featured reporting that included an interview with a seemingly credible person who claimed to have had a sexual affair with Mr. Hallford during the time he operated Return to Nature and was married to Carie Hallford.   *The Curious Case of: The Funeral Home of Horrors* (HBO television broadcast, February 10, 2025).
[7] Abbey Soukup, "Former Return to Nature owner Jon Hallford accused of lying about stepchildren, 'sexting' stepdaughter." Denver Gazette (April 14, 2024), https://www.denvergazette.com/2024/04/14/former-return-to-nature-owner-jon-hallford-accused-of-lying-about-stepchildren-sexting-stepdaughter-5bbc3a8c-ce23-5dee-b49e-2ec99e8518e0/

stress-level from wearing many hats; the business was expanding, but also, he was working on his standup comedy, taking law school classes, writing his memoirs, and filming a documentary about himself (*e.g.*, Defense Exhibit #1, p. 2-3).  Carie progressed from meeting with families, to being on call at night, and then going alone to remove decedents from their homes.  She has a vivid memory of the first time Jon conned her into doing an actual funeral ceremony by promising to be present for it and then never showing up.

The Hallford's use of the government loans on personal items instead of attempting to remedy the problems they had created is one of the more egregious circumstances of their offense.  ECF Nos. 145, p. 10-11.  While the purchases were mostly self-serving, it is important to note two things:  First, at least some of the money was used on business expenses.  ECF No. 71, ¶ 43, 71-3.  This indicates at least some intent, even if minimal, to properly operate the business.  Second, and more importantly for Carie, she repeatedly requested Jon use the money to purchase a cremator or otherwise use the money for the business.  For the reasons discussed throughout this filing, Carie was ignored and for her part was too scared of the consequences of forcing the issue.

Yet despite all the abuse, or perhaps because of it, Carie remained loyal to her then husband, Jon.  When they were both on bond for the state case, the control and mistreatment continued.  Jon used spirituality and religion to manipulate Carie.  He encouraged them to re-embrace their relationship with God and for Carie to embrace her role as his faithful wife.  He presented their legal problems as God testing their bond.

Carie, as she always had, felt guilty and anxious about abandoning her supposed duty.

Faced with the enormous pressure from her legal problems, she stayed loyal.

      In April of 2024, Jon went into Federal custody on the instant case but did his best

to keep up the dominating behavior.  He would call and text multiple times from the jail,

both expensive activities.  Carie was doing her best to survive while working at Goodwill,

but she could barely walk in the door at her motel without her phone buzzing.  Even from

inside a jail, Jon was still satisfying his own control issues at the expense of his wife's well-

being.

      **C.**    **Update**

      On November 22, 2024, the Court in her state case ordered that she be remanded

to custody.  After the initial shock subsided, Carie felt a sense of relief.  She knew that she

would remain in custody for many years, but at least the communications from Jon would

stop.  Over the next few weeks, the fog in her mind from the years of abuse started to lift.

Almost exactly a year earlier on November 21, 2024, she had completed an interview for

her presentence report.  At that point, she described her marriage as "strong" and said that

she felt God wanted her to stay in her marriage.  ECF No. 71, ¶¶ 104 and 111.  However,

the further away she moved from Jon's influence, the more clear it became he had been

manipulating and abusing her throughout their marriage.  Even though he tried to keep up

the pressure by sending messages through family members, Carie finally had a clear mind

and knew what she had to do.

      On August 27, 2025, Carie filed a petition for dissolution of marriage in Jefferson

County Colorado Case No. 25DR727.  After being completely away from Jon for some

nine months, she had the clarity and the nerve to finally rid herself of the abuse and

control.  Although she will be behind bars for the next decade or more, she finally feels

free.

## IV.  Deterrence and Future Crimes

Generally speaking, (2)(B) of 18 U.S.C. § 3553(a) calls for the Court to consider

deterrence to the criminal conduct at hand.  (2)(C) of the same statute calls for the public

protection of the further crimes from the defendant.  18 U.S.C. § 3553(a)(2)(C).

Considered together, the sentence imposed should both generally deter the public from

this type of crime and specifically deter Ms. Hallford from committing crimes in the future.

*See*:  *United States V. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2010); *United States v.

Corchado-Aguirre*, 2015 WL 10383207 at *13 (D.N.M. August 31, 2015); and *United

States v. Jimenez-Marquez*, 750 F.Supp.3d 1267, 1273 (D.N.M. September 24, 2024).

The proposed sentence sufficiently accomplishes both goals.

General deterrence is one of the "key purposes of sentencing" and "becomes

particularly important when the district court varies substantially from the sentencing

guidelines."  *United States v. Walker*, 844 F.3d 1253, 1258 (10th Cir. 2017) (citations

omitted); *United States v. Crosby*, 119 F.4th 1239, 1250 (10th Cir. 2024).  Here, the

government is requesting a sentence that is 185% of the guideline maximum.  ECF No.

145.  Certainly, such a sentence would vary "substantially" from the guidelines.

In terms of deterrence, the only difference between Ms. Hallford's proposed sentence and

the government's sentence is the length of time in prison.

Therefore, in order to be convinced that an 83-month upward variance is not greater than necessary to accomplish the goal of deterrence, one must start by first affording maximum rationality to a prospective criminal considering whether to repeat the criminal conduct in this case.  Having done so, one must be convinced that such a person would be deterred from the crime knowing the sentence was 180-months but would not be deterred knowing the sentence was only 97-months.  Defense counsel posits that such a person does not exist.

What is far more likely is that any person acquainted with the sheer scale of Ms. Hallford's punishment will be deterred.  First and foremost, Ms. Hallford will be spending at least the next decade in prison for her actions.  She has become a federal felon and a 190-times over state felon.  She has cost herself meaningful contact with her children. She lost her job and her ability to return to her profession.  She was excoriated in the press, a google search returns hundreds of entries across innumerable platforms.  She found out her husband had an affair via a documentary about her crimes on HBO.  She will miss graduations, marriages, births, and funerals as her children age through their 20s and her parents through their 80s.  She has nothing and will continue to have nothing at least into her 60s, if not later.  She will live in infamy with unbearable guilt for the rest of her life.  It is not hyperbole to say her actions cost her everything but her existence.  Any sensible person that learns what Ms. Hallford did to herself will decide against following the same path whether the sentence is 97 or 180 months.  As that is the case, 97 months is sufficient but not greater than necessary to accomplish general deterrence.

As for specifically deterring Ms. Hallford from future criminality, her friends and family describe her as a hard-working rule-follower. She has no criminal history whatsoever. ECF No. 71, ¶¶ 100-102. She continues to follow rules both when she was out on bond and since she was taken back into custody. For over 40 years she proved to be a dependable member of the community and had no connection to the funeral industry. As detailed *supra*, the conditions surrounding the crimes she committed in this case were very specific and circumstantial. Sending her to prison for 180 months instead of 97 would have no tangible impact on the likelihood that she would commit crimes in the future.

## V.  Retribution

Ms. Hallford does not deign to characterize her crimes as something less than serious and hopes that her significant prison sentence promotes a type of respect for the law that she previously had and lost along the way. 18 U.S.C. § 3553(a)(2)(A).

The idea of a "just punishment" is more difficult to address.[8] At the outset, Ms. Hallford believes it appropriate to update the Court on her state prosecution as she will be suffering significant punishment in that case for her role in committing forgery, money laundering, and abuse of corpses. Ms. Hallford pled guilty to 190 counts of "Abuse of a Corpse," a class six felony in Colorado State Courts. § 18-13-101, Colo. Rev. Stat. The elements of that crime include treating "the body or remains of any person in a way that

---

[8] "Section 3553(a)(2)(A) requires sentencing courts to consider the need for the sentence 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense,' or in one word, 'retribution.'" *United States v. Crosby*, 119 F.4th 1239, 1249 (10th Cir. 2024) quoting *United States v. Walker*, 844 F.3d 1253, 1256 (10th Cir. 2017).

would outrage normal family sensibilities." *Id*.[9] Her plea agreement will see her sentenced

somewhere between 25-35 years.[10]

While the general public seemingly believes state prisoners only serve a fraction of

their time, Ms. Hallford is very likely to remain in prison for most of her sentence.  It is true

that Colorado state law makes any person convicted of a class 6 felony parole *eligible*

after serving 50 percent of her sentence.  § 17-22.5-403, Colo. Rev. Stat.  Eligibility,

however, is much different than mandatory release.  Various sources indicate that a given

inmate will be granted discretionary parole roughly 35% of the time with those numbers

subject to political and budgetary considerations.[11]  This means a clear majority of inmates

will serve past their eligibility date.  All of which is to say, assuming *in arguendo*, that Ms.

Hallford receives a 30-year state sentence, she is statistically very likely to serve well over

15 years.

---

[9] As Mr. Hallford pointed out in his filing at ECF No. 108, the statute was specifically amended in 2020 in response to victim input.  The victims and legislature felt punishment needed to be enhanced from a misdemeanor to a felony because the crime was widespread and something more than a deceptive business practice.  Sam Tabachnik, *Abusing a corpse could soon be a felony in Colorado*, The Denver Post (December 30, 2019), https://www.denverpost.com/2020/01/21/sunset-mesa-megan-hess-bill/; Colorado General Assembly, Floor Vote on HB20-1148 (March 13, 2020), https://leg.colorado.gov/bill_votes/14867;

[10] In Colorado State Case No. 23CR4849, Mr. Hallford pled guilty to same crime with an identical number of counts.  However, his sentencing range was 30-50 years in the Colorado Department of Corrections.  On February 6, 2026, Mr. Hallford received a 40-year term of imprisonment.  State prosecutors have filed an initial request for restitution on behalf of the victims in the amount of $69,717.15.

[11] Prison Policy Initiative, Discretionary Parole Grant by state, 2019-2022. https://www.prisonpolicy.org/data/parolerates_2019_2022.html; Joint Budget Committee, Department of Corrections, *Staff Budget Briefing FY 2026-27*, Justin Brakke, JBC Staff, December 19, 2025, pp. 52-57, https://content.leg.colorado.gov/sites/default/files/fy2026-27_corbrf_0.pdf; Shelly Bradbury, *Colorado men's prisons will run out of space in next fiscal year, state warns*, The Denver Post (December 24, 2025), https://www.denverpost.com/2025/12/24/colorado-prisons-full-men-overpopulation/.

Ms. Hallford mentions her likely three-decade sentence to state prison as part of the overall picture for the Court as it decides what just retribution should be in the instant case. Another consideration is that 97 months is the maximum sentence in her guideline range and that length of time in prison will ruin the rest of her life. After many years in a prison environment, she will be released as she is approaching retirement age with no family, no income, and no place to live. It seems unlikely that her children, having been without their mother through their 20s, will be a source of support at that point. That bleak future and her associated suffering should provide at least some sense of justice.

The impact statements before the Court make it clear that most of the victims will not feel satisfied with the sentence that the Court hands down. Almost universally, they acknowledge that no sentence could heal the pain they feel. Some believe Ms. Hallford should never see her children again, that she does not deserve basic human decency, that she should spend the rest of her life in prison, and that a life sentence would be reasonable and just. ECF No. 71-2, pp. 7, 28, 52, 92, and 135. Ms. Hallford could offer some comfort by listing the various ways she has suffered (*e.g.*, deprivation of freedom, fractured relationship with her children, divorce, financial ruin, familial embarrassment, etc.), but it seems unlikely that will bring anyone comfort. This paradox makes this sentencing factor extremely difficult for any criminal case, but especially the instant situation. If the sentence can only provide a "semblance" of "imperfect" justice and comfort to the victims, how does the Court decide the length? ECF No. 145, p. 10.

## VI. The Guidelines and the Disparities

On February 24, 2025, the Court rejected Ms. Hallford's previous plea agreement finding that it was not in the public interest.  ECF No. 86.  That previous plea agreement called for a prison sentence somewhere between her calculated guideline range and 15-years.  ECF No. 49.  On June 27, 2025, Ms. Hallford's co-defendant received a sentence of 240 months imprisonment.  ECF Nos. 117 and 121.  Ms. Hallford is not naïve to the implications of that procedural history, nor does she wish to draw the ire of the Court by requesting a guideline sentence that the Court clearly suspected was not in the public interest.  ECF No. 80.

However, Ms. Hallford still believes the guidelines properly provide a range for her fraud conviction under 18 U.S.C. § 1349.  U.S.S.G. § 2B1.1.  Moreover, even if the Court ultimately disagrees with the length, the range established for the applicable category of offense as set forth in the guidelines is a sentencing factor for the Court to consider.  18 U.S.C. § 3553(a)(4)(A)(i).  In this case 97 months is the top of that range.  Also, that range increased in size due to the nature and circumstances of the offense.  ECF No. 71, ¶¶ 84-88.  For example, the breadth of the crime (number of victims), the depth of the crime (sophisticated means), and the danger (reckless risk of serious bodily injury) have all been accounted for in her total offense level and accompanying guideline range.

The Court will be familiar with the Judiciary Sentencing Information (JSIN) from Mr. Hallford's pleadings.  ECF No. 108, p. 12.  Ms. Hallford points to that same data in hopes that her sentence avoids an unwarranted sentencing disparity between herself and those with similar records and conduct.  18 U.S.C. § 3553(a)(6). Information for FY2025 was not yet available so the available data remains the same.  By way of review:  During the last

five fiscal years 163 defendants were sentenced without a § 5K1.1 reduction under U.S.S.G. § 2B1.1, Offense Level 28, and Criminal History Category I.  161 received sentences to prison and the median length of time imposed was 60 months.

Ms. Hallford does acknowledge that the facts of her case "need not be 'extraordinary…to justify any statutorily permissible variance, even one as large as 100%.'" *United States v. Rios*, 2025 WL 2964071 *4 (10th Cir. 2025) quoting *United States v. Lucero*, 130 F.4th 877, 997 (10th Cir. 2025).  However, the requested sentence from the government is 300% that median sentence while the 240 months received by Mr. Hallford sits at 400%.

Concerning other applicable guidelines, Ms. Hallford humbly requests the Court order that the instant case run concurrent to El Paso County Case No. 23CR4856. U.S.S.G. § 5G1.3(c).[12]  Ms. Hallford believes her case matches the criteria of that guideline and respectfully requests the Court follow its guidance.  *Id*.

## VII.  Restitution

Throughout her life, Ms. Hallford has held a strong work ethic and firmly believes part of her rehabilitation should include paying restitution, particularly the money she owes to the victims.  Before Mr. Hallford convinced her to join his business under the auspice of

---

[12] Additionally, if the Court is inclined to sentence Ms. Hallford to 240 months, she would request an adjustment of 14 months to compensate for the time she has been held on the instant case. ECF No. 62; U.S.S.G. § 5G1.3(b), (c), n.3, and n.4(E); 18 U.S.C. §§ 3553(a) and 3585(b), and § 18-1.3-405, Colo. Rev. Stat.  She has been held on the instant case for that time and will not be credited for it by the BOP because Colorado state law requires her to receive it at her state sentencing.

saving the family financially, Ms. Hallford had her own successful career as a clinical

pathologist at Pikes Peak Regional Hospital.  ECF No. 71, ¶ 128.

Ms. Hallford has shown she can stay employed despite adverse conditions like

those she will face upon her release from prison.  While on pre-trial release in the instant

case she was able to follow the Court's order to maintain employment by working at

Goodwill Industries and Hobby Lobby as an associate.  *Id*. at ¶¶124-125.  She has the

education and work ethic to obtain and keep employment.  It is realistic that she can

meaningfully contribute to repaying the victims.[13]

As Mr. Hallford detailed in his sentencing filing, there is no meaningful avenue to

making money while incarcerated.  ECF No. 108, p. 19-20.[14]  Moreover, as a female

inmate, Ms. Hallford will be housed in one of 29 facilities used for women.  Of those 29,

only two are active UNICOR locations that exclusively house female offenders.[15]  One of

those facilities is FPC Bryan.  Ms. Hallford respectfully requests the Court include her

request to be housed there, not only for the opportunity to save money that can later be

used for restitution, but also due to its relative proximity to her parents' residence in

Oklahoma.

---

[13] For example, if Ms. Hallford finds a job making $20 per hour, she could easily contribute
$1000 per month towards restitution.  Meaning, in the time difference between the defense and
prosecution requested sentences she could restore some $83,000, or almost half, of the
$193,966.18.
[14] Accordingly, Ms. Hallford requests a similar instruction that "payment of criminal monetary
penalties shall not be due during the period of imprisonment."
[15] https://www.unicor.gov/About.aspx#FactoryMap;
https://www.bop.gov/inmates/custody_and_care/female_offenders.jsp#female_facilities.

**VIII.  Conclusion**

To be sure, there is no "general rule" against the Court relying on a single

sentencing factor and a "single factor may dwarf other considerations."  *United States v.*

*Candelaria*, 151 F.4th 1261, 1267 (10th Cir. 2025).  But the proposed sentence from the

government goes beyond dwarfing and it does so almost exclusively on the back of two

factors:  the nature of the offense and retribution.  15 years in prison would come at the

expense of restitution and ignores sentencing disparities.  The government admits there is

a "dearth of cases with a similar fact pattern" which calls into question the impact of

general deterrence.  ECF No. 145, p. 14.  Implying there may be further crimes by Ms.

Hallford ignores the first 41 years of her life.  It would seem then that an upward variance

in this case would be based solely on the offense circumstances and just punishment.  For

the reasons stated *surpa*, those circumstances, as lived by Ms. Hallford, merit some

leniency, certainly as compared to Mr. Hallford.  97 months in federal prison followed by

three years of supervised release sufficiently accomplishes the goals of sentencing without

unduly punishing Ms. Hallford.  18 U.S.C. § 3553(a).

Ms. Hallford knows that there are no excuses for what she did as part of Return to

Nature.  The horrifying facts have been presented in this Court, the state Court, and in the

media.  By failing to stand up to Jon Hallford initially, she immediately painted herself into a

corner where she chose the worst of her two options.  She should have left Mr. Hallford,

alerted the authorities and trusted that the moral choice would have led to a suitable

outcome. Certainly, that choice would have ended her marriage, left her broke, devastated

her children, and risked her ability to remain their mother.  Instead, she decided to keep

suffering through the abuse to maintain a charade that victimized many people.  In the end, she lost her ability to be a mother, ended her marriage, will be perpetually bankrupt, and will spend many years in prison.

The word regret does not even begin to describe the feeling she carries around with her daily.  Many victims have shared their stories of suffering through persistent feelings of sickness and horror.  Some do not believe those feelings will ever fade.  Ms. Hallford apologizes for what she has done to them.  More pointedly, she hopes the victims find some comfort in knowing that she has lost everything she ever cared about and that each day she lives is a waking nightmare of shame and remorse.

Respectfully submitted,


Dated:  March 4, 2026                    s/Robert Charles Melihercik
                                         **Robert Charles Melihercik**
                                         Melihercik Law LLC
                                         7765 Wadsworth Blvd., #746327
                                         Arvada, CO, 80006
                                         Phone:  720-7078-2852
                                         Email:  chaz@meliherciklaw.com
                                         *Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify on March 4, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system, which will send notification of such filing to all attorneys of record.

s/ Robert Charles Melihercik
**Robert Charles Melihercik**